case number 21-3032. United States of America versus Theodore Douglas appellant. Mr. Axum for the appellant. Mr. Hansford for the appellate. Good morning, Mr. Axum. Good morning. May it please the court, counsel, Tony Axum representing the appellant Theodore Douglas. I'd like to reserve three minutes for rebuttal. Police did not have reasonable suspicion to stop Mr. Douglas. Mr. Douglas's objectively innocent conduct was not of a nature that created reasonable suspicion. And it did not match conduct that the observing officer, Officer Jackson, based on his knowledge and experience, said typically met reasonable suspicion standard, giving rise to a belief that criminal activity was afoot. The facts in this case individually were entirely innocent and collectively, even when combined with the high crime nature of the area, did not rise to the level of reasonable suspicion. Mr. Douglas was on a sidewalk open to the public in the middle of the afternoon on a sunny day, which itself was not unusual or suspicious. Officer Jackson testified that he saw someone walk up to him with a bag and the bag didn't come from anywhere hidden. It was openly displayed. Officer Jackson could describe the bag and the person handed the bag to Mr. Douglas, who openly accepted it. The bag itself was not a container that was associated with illicit transactions. It was a small, fancy leather backpack. And Mr. Douglas took the backpack and placed it on his back. And I realize that it's referred to as a backpack the entire time. But government exhibits for and defense exhibit for show that it's it's not actually a backpack with two straps on the side. It's a backpack with a cross strap. And I point this out because it it might not fit easily on the back over the coat. It makes it understandable that Mr. Douglas took his coat off. But the strap on Ross, I mean, obviously. This is not captured on the body worn camera. It's not described by Officer Jackson, but the government exhibits demonstrate that the strap is across, which might not be comfortable to go across the zipper of the coat if you want to unzip the coat. It's also understandable that in a high crime area that Mr. Douglas would wear something that he doesn't want others to see under his clothes or or something that appears valuable to may appear valuable to others out of sight. Oh, let me ask you a question. Given your position about innocent conduct and basically entrapment. Would you take the same position? Were we to accept your description of what the officer saw, but that given his experience, there was a ground to approach. Mr. Douglas and his companion. And ask some questions. Your Honor. Police always have the right to approach a person on the street just as as any citizen can and ask questions. Precisely. That's what the police should do if if if they do not actually have reasonable suspicion, but want more information. And that, of course, is not what happened here. Well, what I'm getting at is. I'm not sure it technically, and maybe you're more familiar with that than the law in this area, technically entrapment, but because the two men voluntarily went into this. I'm going to describe it as an alley you say it's the sidewalk. And this officer saw conduct that was consistent with the type of conduct where he had previously indicated that there was exchange of illegal drugs or some other illegal activity. So I'm just wondering, where is it that you think the line was crossed. Is it when the arrest team came and pushed him against the wall, and, you know, crossed his hands and put the handcuffs on. No, Your Honor, I'd say, in terms of the 4th amendment, there was not reasonable suspicion to actually stop. So, so I guess I thought you agreed the police could say to the 2 men. Hey, guys, I'd like to ask you some questions. We just stop a moment. I don't think there's anything wrong with the police approaching someone and asking questions and asking them to stop and answer those questions. Right. So that's, that's my point. I just want to understand under that scenario. What is the action that was taken by the by anyone of the officers that cross the line. Well, I'd say first, the first officer to reach my client walked up to him and immediately touched him and and touching a defendant is is a is is a touchstone of seizure. I mean, it is once he touched him, he was seized. So that was, that took it past a consensual encounter of simply asking questions. Let me ask you, in all due respect, that's a very broad reading of when an arrest occurs. If I just the officer just tapped me on the arm and said could I ask you some questions. Here there was a push against the wall I realized but given that guns are everywhere. And this officer who called in the arrest team, and presumably the arrest team even knew the alley had a reputation for a place where illegal transactions occurred. Well, can I address I'd ask the court to look carefully at the exhibits submitted both the pictures and the digital exhibits. It's not actually an alley. It is a sidewalk. It's a walkway. There is a fence on one side. There is grass on on either side behind the fences, and then there are apartment buildings. So this is what information that they were out of general public view that you would be in where you out on what I'm referring to a sidewalk. I take issue with that, and that's why I can only refer to the record evidence and the observing officer is parked in a car on the street. So, that fact alone establishes that they were not out of public view. This isn't an alley. It's not a cul-de-sac. It is a walkway from one street to a parking lot on the other side. And it is open the buildings you can look down. It is. It's. I don't want to argue on this point. Mr. Axel, I don't think this is key to your argument, but I just want to understand where the line is crossed in your view. Well, I think the initial touch by a member of the arrest team. I think I think at the point that my client is touched, he sees. But I think that the touch is escalated when the officer immediately puts handcuffs on and it only escalates from there. There are several frisks. There's there's accusatory questioning and he's led away. There are officers on both sides. There's an overwhelming show of force by multiple officers. The government contests that there was a seizure from essentially the moment that the officers encountered him. Oh, I don't think that the government was a seizure. I don't think the government questions that it was a seizure from the outset of contact with. What what information did the officers who conduct the two officers who were first on the scene, the uniformed officers who conducted the frisk? What information did they. The only information they had was what they had been told by. Well, that's what I said. What were they told by Officer Jackson? According to Officer Coupart, he was he he was not told anything except to stop this individual person in the blue jacket. He just gave them a description of who they were without without any other information. Or is that clear on the record? It's not clear to me. You know, I may be missing some. I I would. I'm not I'm not sure I would take a moment. But I know why I'm asking this. As I recall, there is a doctrine under the Fourth Amendment and also under Tory versus Ohio that the officer who conducts the frisk conducts the search. If that officer receives information from another officer and the first and the officer that conveys the information may be mistaken. Nevertheless, the search is valid if the information that the searching officer gets would justify the search. I know that I haven't stated it very well. Yes, I'm familiar with that line of cases. But that line of cases deals specifically with warrants and information contained in databases. That is sometimes not accurate. Warrant license revocation has never been applied in a Terry versus. I'm not aware of it ever being applied. And there is rejected those. It hasn't been rejected, but there would be very good reason for rejecting it because it essentially create good faith exception to officers observations in the field. So if they thought they saw something and and the objective facts revealed that they did not see that as long as they thought they saw it, their good faith reliance on what they believed at the time would sustain a Fourth Amendment violation. Fourth Amendment does not keep the Fourth Amendment itself. It's the same good faith exception for officers observations in the field. If Terry and really every every significant Fourth Amendment decision goes directly to what are the objective facts, not are not not. What did the officer believe or what did what did the officer what what did the facts appear? The question is not did it appear to be money? The question is whether it was money. And that's that I'd suggest to the court. That's the only way that the court after the fact when. Outside of the heat of the moment, I'm actually a neutral evaluation of the situation can only look at the objective facts. So one thing that troubles me about this case, and I'm going to ask your friend on the other side is some government's exhibit. Three is the radio communication. And the officer, I believe his name, Jackson. That's correct. Who was undercover and did the observation. You know, he he posted the lookout and the description of the people he wanted to be stopped that he saw, you know, undertake this hand to hand exchange. He thought might have been a drug transaction. And then he says he needed the officers to check that book bag for. Essentially giving them a directive that that's what he wants. He wants the book bag be checked out. And the reason that that alerted me is because, you know, as the Supreme Court has said in many cases, including New Jersey, The purpose of the Fourth Amendment was because the framers were concerned and rejecting the pre-revolutionary practice of having soldiers without any sort of warrants or judicial supervision undertaking search. In here, it wasn't the directive to stop these people, question them, you know, you know, see, see if, you know, you can learn anything that would either confirm or dispel the suspicion that there was an illegal transaction. I mean, check that book. But when do officers without warrants get the authority to just tell other officers to go essentially search book bag first container that someone on the street is here. I don't think there's any authority for that. There's certainly no authority under Terry to immediately search a container that someone is carrying. And I think the officer's actions in this case bear out that they were there to search, to search the book bag. Officer Poupart, through a series of escalating intrusions into, and Officer Taylor, a series of escalating intrusions into my client's personal space and personal property, walk up to him immediately like start squeezing his back. It's not what you would picture a typical frisk. They don't start at the top and move around. They both immediately go to the back, just as they were instructed to by Officer Jackson. That, we'd submit, was closer to a search at the very outset. But they don't stop at squeezing, manipulating, and trying to figure out everything in the bag. Officer Poupart and Jackson take additional steps. Officer Poupart at one point asks for consent to search the bag. They unzip Mr. Douglas' coat. They pull the coat down over his arm. These are not minor indignities. This is a full-on search. And the Fourth Amendment simply doesn't allow that process. I mean, to Judge Rogers' point, it would allow them to walk up and try to dispel any suspicion that they may have. While we're submitting that the facts in this case don't establish even the minimum of suspicion, officers go right past that point and are into a full-on search. To go back to where Officer Poupart is, after he has unzipped my client's coat and has been denied permission to search the bag, he then waits again for some other authorization from someplace else. You can tell on the radio. I think it's a fair assumption that it's Officer Jackson saying, yes, unzip the bag. And he unzips the bag. So he's being directed by Officer Jackson. I know it shows that he's feeling around in the bag before he unzips it. And the video indicates that he found something. That's correct. But even within the context of tearing and a frisk, officers are allowed to frisk, but not to frisk to search. The feeling of a hard object with a barrel and a handle is what the testimony was. It gave him probable cause to open the bag. That wasn't part of the frisk. Once he felt that, then there certainly was probable cause. Of course, he would not deny that. If that is indeed what he felt. What you have to argue is he was not entitled to even pat or feel the bag. That's got to be your argument. Once he does that and feels the outline of a gun in there, he's got probable cause. Well, I think there are two aspects to frisking. One is the actual frisk, and two is feeling the outline of a gun. You're to frisk to rule out that there are not weapons. You're not supposed to frisk to search to figure out everything that is in the bag. And by Officer Kupar's own testimony, he testifies that he's trying to articulate what is in there. He is trying to palpitate what is in there to figure out. Those are his words, to figure out what is in there. That is a search. That is not I am patting him down to rule out that he has a weapon. He does not actually testify that I felt a harm. To make sure there's no gun in there. I'm sorry? I mean, that happens in every frisk. Where they feel in the pockets and in the belt and so on. To make sure there's no weapon there. That's what he's doing. That's correct. But again, this is not a pocket. This is not something against the body of the person. It is a bag. And what he is describing is manipulating the objects in the bag to figure out what they are. That is a search. And I understand that it is a small distinction, but it is a significant one in the Fourth Amendment context. Because if every time an officer stops someone with a bag, they can methodically steal each object. To be clear though, you're not arguing, at least I don't believe I saw it in your argument, that you can't, that a bag is outside the scope of a frisk. I'm not arguing that a bag is outside the scope of a frisk. If, for example, Officer Coupart had said, I was feeling, I felt something hard and wanted to figure out what it was, that's different. But he feels outside of the bag. He feels something that he says seemed to be a glasses case. And I continue to articulate what else was in there. At that point, he has not said, I figured out there was a gun in there. He doesn't put his hands on the bag and say, aha, there's a gun. That's not his testimony. He doesn't have to say that as long as he has some cause to believe it may be a gun. That's what probable cause means. But his testimony has to be that I thought it was a gun. I mean, to get to probable cause, it can't be that I wanted to figure out everything that was in there. Probable cause means it's sufficient if he says, I thought it might be a gun. That's enough. Why don't you wrap up? We'll give you some time on rebuttal. I mean, I suppose that takes me to really the third argument that I raised, which is if Officer Coupart thought it was a gun, he did not react in a way that suggested that. It's our position that he did not. And it's just it's inherently incredible that he believed that he was touching a gun and he continued to squeeze it for so long that he did not immediately seize it. If he thought he had probable cause to seize it, he didn't need to ask Mr. Douglas, may I have permission to go into the back? He didn't need to call radio in for further permission from Officer Jackson to go into the back. I'd submit that looking at Government Exhibit 4. We'd have to find the district court findings otherwise. Yes, this court would have to be left with a definite and firm conviction that the findings were clearly erroneous that. And I'd submit they are so inconsistent with what we would expect from a police officer and human nature and knowledge that they are. We have your argument. We'll hear from you on rebuttal. Mr. Hansford. Good morning. May it please the court. Eric Hansford for the United States. Each of the defendants, three arguments for suppression fails. First, the district court correctly concluded that when an experienced undercover officer who was operating in the United States, being in a block known for drug traffic, saw the defendant engage in a hand-to-hand transaction, and then saw him immediately and hurriedly hide the backpack he'd just gotten underneath his jacket, the police had reasonable suspicion to stop the defendant for investigation. Second, this was a terrorist stop and not an arrest. Police specifically told the defendant they were stopping him as part of an investigation for a minute. And the officer's on-the-ground decision to use handcuffs in this case was reasonable. Even if the handcuffing had been unreasonable, that would not be a ground for suppression. And third, the defendant fails to show clear error in the district court's credibility on the scope of the search. And instead, the body-worn camera is very much consistent with the testimony about the scope of the search. Let's start with your first argument. First issue. Officer Jackson testified at, was it a preliminary hearing? He testified both at a preliminary hearing, but the suppression hearing is what is really here. Because the testimony that seemed to be cited in the district court's order was from a preliminary hearing, I thought. I don't think that's correct. I think it's from a suppression. But at any rate, the testimony that was cited, at least what I read, said that he did not know whether what was exchanged for the bag was money. A light-colored object that could be money but may not have been money. And then, of course, no money was found on the gentleman that he had the hand-to-hand exchange with, right? So no money was found, but both the testimony of the officer and the district court's findings are that it appeared to be. So on A247, the officer says, the undercover officer says, it appeared to be the exchange of U.S. currency. And on A159, in the district court's opinion, it says that Williams handed, the other person handed Douglas the backpack, quote, in exchange for what appeared to be money. So that's both in the district court opinion and the officer's testimony. And that is very much consistent, more broadly, with how the officer. There was cash recovered from Douglas, wasn't there? No cash was recovered from Williams, meaning the person. But there was cash, yeah, there was cash recovered from Douglas.  But I think in terms of the lack of recovery of money, it was, and the district court addresses this in its opinion, Williams saw Douglas get searched. And then Williams continues. The reason I'm asking that question is, is it clear that whatever was exchanged was something Douglas gave Williams or was it the other way around? Or could they not tell what was going on? So the undercover officer's testimony is that Williams, who's dismissed, gives the backpack to Douglas. Douglas then gives back a small, light-colored object that the officer testifies appears to be money. But the lack of money recovered in this case, the district court says, you know, Williams sees. I read the district court's findings different. I read that the district court found that there was a hand-to-hand transaction. The district court found that Jackson thought, believed that it was currency. But that's, I'm not sure what that gets you. He might have believed that it was currency, but he testifies under oath that he didn't really see, couldn't really see what it was. But he believed, because there was an exchange, that it was likely currency. That's a hunch. So it's two answers to that. First, it's not a hunch. He describes, based on the size, the color, how it's being handled, why it is he believes it's currency. And that's in footnote five of our brief. That's collecting all those record sites. But the more important point, I think, is that the key is that there's an exchange, that it's not just someone receiving an object. So what this court says in Johnson is receiving an object has many innocent explanations. But this court in Johnson specifically says there was not an item exchanged in that testimony, in that very sentence. The court is saying receiving an object has many innocent explanations. So this was a hand-to-hand transaction, just as the undercover officer testified he was looking for. And then on top of that, we have to look at the totality of the circumstances. So the Wesby rejects the sort of divide and conquer approach to looking at each factor individually and trying to determine whether or not we can provide an innocent explanation for each one. We have to look at the full picture. So what we have is that this is a block that's known for drug trafficking, a sidewalk where the undercover officer himself has seen prior drug deals. He sees the hand-to-hand transaction he's looking for. And then he sees Douglas make this suspicious movement of hiding the backpack underneath his jacket. But I have not seen a case from our circuit where the object that is exchanged, even if we assume that it was a reasonable belief that what he saw Douglas hand money to William, the object that he got in return in that exchange was a bag. It wasn't packaged like anything that, you know, small baggies or anything like resembling drugs. He had no prior knowledge about either of these individuals. So the prior knowledge that he had was of the neighborhood and what occurred in the neighborhood. So it seems to me that we would be breaking new ground to say that this is reasonable, articulable suspicion. To walk up to somebody in broad daylight who's in a public area after making an exchange where you can't even be sure that it's currency, but you see someone hand someone something and get handed something back. And it's a bag that they put on and then they put their coat on over it and we're going to assume that that's concealment. Even though furtive gestures is only credited when it's furtive because you're trying to hide something from someone you know to be police. But this was an undercover and so they weren't trying to hide anything from the police. So we're going to break new ground and say that you can just walk up to somebody and then handcuff them and detain them based on that. So I think there was a lot in that question and I want to kind of make three points. I don't think this would be breaking new ground. I think specifically the green case that we cite in the briefs from this court finds probable cause in very similar circumstances. There's a lot more in green. There is more in green, but it's also probable. Well, I'm not sure there is a whole lot more in green, but we agree there's more in green, but it's also a much higher standard of probable cause. This is a reasonable suspicion. The question is whether the police can stop the person just to investigate what's going on. Well, they were told I want you to check that back. So that's what the directive was. You agree with that, right? So I do not agree with that. So your honor. I didn't hear that on the tape. You want me to tell you where that is on the tape? I think there were a number of questions about reasonable suspicion. If I could address those before we go to the scope of the frisk, because this court. It goes to the frisk. It goes to the question of was this a frisk or was this stop them so you can check the bag? So I'm happy to address the frisk, but I do have the court asked me a number of questions, including about furtive movements that I do want to be able to address the questions about whether or not furtive movements or concealment can be considered absent the police involvement. Green case specifically says another undercover officer case specifically says when the people are sealing the object that is being exchanged, that that is something that provides the police with suspicion. That's one of the key green factors that sites and that's an undercover officer case that is not in response to police presence. And so if somebody gets something and they put it in their pocket, that's concealment. No, your honor. I mean, it's all. Well, they're hiding it. So every time someone puts something somewhere where it can't be seen, that's suspicious. No, your honor. But so you have to look at the circumstances and whether or not it looks like they're hiding something or they're not. So in this case, what the officer describes is that he's putting takes off the jacket burningly. He puts the backpack on, then puts the jacket over it. I think this court is supposed to use its common sense in trying to assess whether or not that's suspicious. The officer testifies that it is suspicious in the experience undercover officer. And that is very similar to what this court found in green was suspicious and helped by the reasonable suspicion. I think it's also a site. The Supreme Court's Sitron case, which is the Terry companion cited in the reply brief there. The court sites for tip toeing in an apartment hallway. And that is, I think, actually the source of furtive movements or furtive actions. And if case law that is not in response to police presence, that's just, you know, the public defender for 10 years. And there are a lot of people who who are represented in their families. And lived in neighborhoods like this and made way worse neighborhood. And they did things that were a little different in the way you and I might. They did things like, you know, guys didn't carry wall. Because the wallet was just a convenient compartment for a robber to feel all of their money. Instead, they hid their money. Women hid their money in their bra. If they wore a purse, it was a very small that they could put underneath the jacket. So they couldn't be seen. That's what that's that's another consequence of living in high crime. Sure, I do. I'm asking you these questions about concealment. Of course, your honor. And I understand that there could be innocent explanations, especially when you're taking the factors one by one. But the question here, it's far less than preponderance of the evidence. It's less than probable cause. It's just whether or not the police can stop the person to investigate what's going on. And here we do have very good record evidence from the undercover officer that he's looking for this sort of hand to hand transaction. He describes the backpack transfer as being consistent with this all narcotics or firearms transactions. He's looking for people to hide as part of these hand to hand transactions to hide what they're doing, consistent with what this court said. And so you have the record. I was Williams carrying the back. He have it on his. Was he carrying it by hand or was it on his back? He was just carrying it by hand. Was the record in terms of your honor. You also asked about the frisk here. With the testimony or or the undercover officer saying to check the bag. I don't think that's cited in the briefs or suggested that that's kind of under the reason for the press. My recollection. So I haven't specifically reviewed that part of the. The government's exhibit three. That's true. Radio communication. Yes, you're right. You put in evidence. You're right. So all I'm saying is that my recollection is that comes after the press. It may be wrong because I haven't specifically checked that. I don't think that was an argument that was made, but my recollection is that the officer Jackson said that after the press that occurred. That that is my recollection in this case. But but I think the more important question is that what we're operating on is objective standards, not subjective standards. And this risk in this case was proper. As Jeff Randolph was saying, they feel an L shaped object in the back. Indeed, if you look, especially at government exhibit four, but if you just look at appendix page one fifty, which is a still photo from the body worn camera. You can see the L shaped outline of the heart object at the very outset of the press. Which which which exhibit is this? This is I believe it's four, but it's a one fifty in the appendix. Appendix one fifty is where you see that. You can see it better in the video where he's moving the object and you can see this whole L shaped move. But but that is where you're seeing. And more importantly, I think the the question is not whether the body worn camera definitively proves what the officer is saying. But whether whether the officer does testify that he feels this hard object and recognizes it as a gun. The very first seconds of this risk, we collect that. And so the officer is testifying that he he knows almost from the outset that he has a gun in this case. And so at that point, the officer is free to squeeze the object to make sure that it is a gun. As long as he's looking for a weapon, he is free to do those things. And so that does not go beyond the scope of the press. I think this court. So you would say that that distinguishes this from Minnesota v. Dickerson, where the officer. We use the bag and continued squeezing, not because the officer thought that there was a weapon, but because the officer just wanted to figure out what was in it. That's correct. And this court in Johnson specifically says the limitation imposed by Dickerson is that once the officer finds an object on the person of a suspect, he may not palpitate it more than is necessary to determine whether it is a weapon. Once he as long as he thinks he has a weapon, he is allowed to determine if it's a weapon and to take the weapon, to disarm the person who he's stopping for officer safety. That's what happens in Terry Holmes from this court seems for that proposition as well. The Dickerson issue is when you go beyond looking for a weapon. And you have an object, you know, is not a weapon. You are continuing to search. That's when there's an additional search. That's when there's a problem. So one of the questions here, isn't it that most of these cases occur where the outline or the hard object that seems to be a gun is on the physical person of the defendant, not in a separate bag that would have to be unzipped for the person carrying the bag to actually take it out and threaten the officers. So what do you do with that fact? So I think there are two parts of that. One is that I understood from Mr. Axsom's argument earlier that he's not disputing that part of the permissible risk was searching the back. Ask my question. Answer my question. Sure. So the the what we have here is that the defendant, he's he's wearing the backpack and it's under his jacket. So if you watch the body worn camera, there's not like it's not like there's a separate bag that they are kind of feeling that couldn't be easily separated from the defendant. He's wearing the officer. All he needs to take the bag presentation. There's no reason to open the bag. I mean, I think the invasiveness of taking the bag would be more than just risking the defendant because the bag is under the jacket. In order to bag, they would have to unzip the jacket. The physical of the defendant, threatening the officer with the gun. Unless he takes several steps. Either he asked, would you say take off his jacket. Then he has to take off the bag. Then he has to unzip the bag. Most of the case, don't present this type of obstacle to getting to the source of what may endanger the investigating officer. So, I think the, I think that's kind of looking at it from hindsight. No, no. The arresting officer knew what he felt was under the jacket in a bag. So, that's not after the fact, it's what he was presented with the facts, and you do not want to acknowledge what's in the government exhibit about the instruction from Jackson was to check the bag. That's very different than the Terry stop for purposes of investigation, where the officer can take reasonable steps to protect himself from injury or something like that. So, what the officer testifies here is in the 1st, 5 seconds, or in the 1st, few seconds of risking the defendant. He feels this guy, he feels this guy immediate. And so I'm not sure if the court is asking about that initial feeling of the gun, or if the officer can take. Very, and what Supreme Court was concerned about, and what most of our cases and you haven't cited one that I'm aware of are concerned about officers safety in approaching a defendant. So here, Jackson didn't say, I think there's a gun in the bag. He said, search the bag. So, we do not think distinction, those facts, and the usual facts, where the defendant who is being investigated by the police. In this Terry context has ready access to a weapon. So, these, this course, he says, do not require the, the police officer to figure out exactly how easy and a weapon that's on his body is going to. I have a hypothetical, I have it in a locked bag. I can't get to it. The officer can't get to it until I unlocked the bag. And essentially, it's locked here to the extent that the officer knows it's under the jacket. So, it's unavailable to the defendant until he takes off the jacket. And then because whether it's described as a backpack or cross strap bag. Yes, take that off to. And I think, talk about objective facts and totality of circumstances. I don't think you can ignore that you have to come to deal with it. And plus your own exhibit, directing the officer to check the bag. So, two things, one, Mr. I believe just conceded that the, that is okay for the police to be frisking the back that that is permissive. I wish you would deal with my questions. What I'm dealing with is what the Supreme Court was concerned about, namely, officer's safety. And so, protective searches, protective frisks, you know, taking the totality. So, the case law. I'm sorry. So, the case law says if a person has a weapon on them, or already ready access to a weapon. Those cases are not talking about a defendant to basically unlock the object in which there may be a gun. So, here the object was not locked and the officers. There's an easy answer. I know the answer is what is what is the office when the officer feels something through the coat and in the backpack. What's he supposed to do? I say, oh, sorry, I bothered you. Unleash the handcuffs and let them walk away. I mean, it would be a dereliction of duty for him not to investigate further. Question is whether he had a duty to undertake that in the first place. Let me ask you this question. What is the evidence as to whether they frisked his person and when they frisked his person? So, meaning the rest of his body? Yeah, what you normally happen in a stop and frisk situation where you frisk the person, you pat them down. So, if they ever pat him down, and if so, when? I believe they do, and I think it's in, I guess it's defense exhibit four, which is the partner's video. I think she is searching the front of him, but I think the officer immediately feels the gun. Once he feels the gun, you can see he's tightened his grip on the defendant. Because the first thing that he does is handcuff him, pull the jacket down, and start feeling the backpack. Well, he doesn't pull the jacket down for a couple of minutes. He leaves the jacket. The jacket is up for the first couple of minutes. The first thing he does is he pulls him over, and then he starts frisking his back. And within seconds of starting to frisk his back, he feels the gun. And again, you can see this in the body camera. And this is also what the district court's findings are. This is how the officer— This is one of the photographs shows. That's right. That's A150, appendix page 150, shows that gun. So, what the officer is doing is he starts the frisk with the back. He immediately feels a weapon. At that point, the defendant, I think as Mr. Axum, you know, the defendant is not going to be released until the officers recover that weapon in this case. But the officers are allowed to go in and to recover that weapon once they feel a gun in his back. All right. Any other questions? Judge Rogers? No, thank you. Judge Randolph? No. Yes, this is court to defer. All right. Thank you, Mr. Hansford. Mr. Axum, you didn't have any time. We'll give you two minutes. I would take that time to refer the court to what Officer Jackson said and that he— he may have at some point said something appeared to be money, but that was explored further on cross-examination. And that is what is supposed to happen. You're supposed to figure out what exactly the officer is saying. What do the words appear to mean? And Officer Jackson conclusively explained that he did not know what he saw. He was too far away. He couldn't tell it was money. He couldn't even tell if it was paper. So, that is a 299, a 299, a 278. And I think that's conclusive. With regard to concealing, concealing itself is a generic act. We conceal things—I conceal putting my pen in my pocket. That is a generic act. When you have something that is generic and ubiquitous everywhere, people conceal things all day, as is their right under the Fourth Amendment, as the court points out. In order to attach some criminal motive to it, police have to explain why. And that did not occur here. The officer didn't say, I've seen people who are selling drugs get a backpack and put it under their coat. That's their M.O. He didn't do that. So, the government, if that was the telltale sign of a drug transaction, should have elicited that testimony from the officer. They didn't because it's not, because concealment is a general act. And even the concealment in green that the government relies on very strongly is concealment of drugs. They are by—at sight, you can identify them. The concealment here is of a bag, something that is innocent of itself. So, it makes sense that you would try to conceal something that everyone knows already is criminal. The other thing about green that I point out is that there was currency, paper U.S. currency in green. So, it was an exchange of something, small objects, presumably drugs, or paper U.S. currency. So, green is not on all fours with this case. That is simply inaccurate. The other thing that I want to say, the government keeps referring to a concession. When I concede, I will say I concede. I have not conceded. I admit that I did not raise a challenge to the search of the bag as part of—as a separate search from the frisk. But I did not concede. I want that to be very clear. The last thing that I would refer to is Officer Poupart and his testimony. And I refer the court to A380 where Officer Poupart is asked. Now, when Mr. Douglas says it's a glasses case, at that point in time, you also agree there is at least a glasses case in there. Yeah, or a similar object. What you are trying to figure out is if there is something else in there. The answer, right, if there is something else in there. By Officer Poupart's own admission, he did not know whether there was something else in there. He was trying to figure out whether there was something else in there. That is a search. At the moment, he is trying to figure out and not patting down and immediately realizing that it is a gun. It is a search. And it is beyond the scope of theory and required probable cause. Thank you. We have your argument. We'll take the case under advice.
judges: Wilkins, Randolph, Rogers